# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1850V

| | |
|---|---|
| JAMIE L. HOLMES, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: February 11, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Patricia L. Hall*, Williams McCarthy LLC, Rockford, IL, for Petitioner.

*Ryan Pohlman Miller*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION DISMISSING CASE[1]

On September 14, 2021, Jamie L. Holmes filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") following her receipt of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine on June 11, 2020. Petition (ECF No. 1). However, Petitioner cannot preponderantly establish that her post-vaccination injury persisted for at least six months, as required under Section 11(c)(1)(D)(i). Therefore, her claim must be dismissed.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

### I. Procedural History

In Spring 2022, the case was assigned to the "Special Processing Unit" (the Office of Special Masters's designation for alleged injuries that have traditionally not required extensive litigation). ECF No. 13. Respondent promptly advised that he might formally contest the statutory severity requirement – which Petitioner had not squarely addressed in her Petition or her original affidavit. ECF No. 17.[3] Petitioner thereafter received several opportunities to gather additional evidence while the claim awaited Respondent's medical review. *See generally* ECF Nos. 19 – 36.

On January 26, 2024, Respondent filed his Rule 4(c) Report formally disputing severity. ECF No. 39. Petitioner was ordered to show cause why her claim should not be dismissed. ECF No. 40. On September 9, 2024, Petitioner filed additional records and her Brief. ECF Nos. 41 – 44. On October 4, 2024, Respondent filed a Response, ECF No. 45. Petitioner did not file a reply. The matter is ripe for adjudication.

### II. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete

---

[3] Petitioner's September 2021 affidavit and other exhibits originally filed alongside the Petition (at ECF No. 1) were stricken because of a formatting issue, *see* ECF Nos. 16 – 17.

as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

A potential petitioner must demonstrate that he or she "suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i)[4]; *see also Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

---

[4] Section 11(c)(1)(D) presents two alternative grounds for eligibility to compensation if a petitioner does not meet the six months threshold: (ii) death from the vaccine, and (iii) inpatient hospitalization and surgical intervention. Neither alternative is alleged or implicated in this claim.

3

Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Human Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

### III. Evidence

I have reviewed the entire record including all medical records, affidavits or declarations, and additional evidence, and highlight the following:

- **Contemporaneous Evidence.** Petitioner had no prior history of left shoulder pain or dysfunction. She periodically sought medical care for other issues. *See, e.g.*, Ex. 1 at 20, 79; Ex. 4 at 33, 41 – 43, 51, 54, 61; *see also* Ex. 2 at 113 (health insurance information). She was 43 years old, and employed full-time as a registered nurse, at the time of vaccination. Ex. 5 at ¶ 6.

- On June 11, 2020, Petitioner received a Tdap vaccine in her left deltoid muscle. Ex. 1 at 178. The vaccination occurred in Illinois, at a hospital emergency department ("ED"), shortly after Petitioner had accidentally cut her right hand with a gardening tool. *Id.* at 79. She was discharged in stable condition. *Id.* at 82.

- On June 18, 2020, at about 7:00 a.m., Petitioner returned to the ED for evaluation of post-vaccination left shoulder pain and limited range of motion ("ROM"), which was confirmed on exam. Ex. 1 at 7, 19, 21. X-rays were unremarkable. *Id.* at 22. An on-call orthopedic surgeon assessed "an inflammatory process that is secondary to the injection." *Id.* at 22. Petitioner was instructed to wear a sling, take NSAIDs for pain, and follow up with outpatient providers. *Id.*

- That same day, Petitioner requested an unpaid leave of absence from work, under the Family and Medical Leave Act ("FMLA"). Ex. 14 at 1. Her employer granted the request, specifying a leave end date of September 8, 2020. *Id.* at 1, 3.

- At a June 23, 2020 orthopedic initial evaluation, Petitioner reported that her shoulder pain rated 4/10 at rest, rising to 8/10 with activity. Ex. 3 at 15. She had tried activity modification, heat, ice, wearing the sling, and taking ibuprofen. *Id.* An exam found tenderness, pain, and decreased ROM, but negative impingement signs. *Id.* at 16. Petitioner was assessed with adhesive capsulitis, for which she received a steroid injection and referred to physical therapy ("PT"). *Id.* at 17.

- At the July 1, 2020 PT initial evaluation, Petitioner reported that the recent steroid injection had helped her pain and ROM. Ex. 2 at 106. Her pain was currently 2/10 at rest and 6/10 with activity, particularly overhead movements. *Id.* An exam found reduced ROM and reduced strength. *Id.* Glenohumeral joint mobility could not be assessed due to the pain. *Id.* The therapist planned two to three sessions per week for 12 weeks (i.e., until September 23, 2020), with the hope of discharge to a home exercise program ("HEP") "to ensure carry over of functional gains achieved in the clinic." Ex. 2 at 106; *see also id.* at 86 – 105 (PT sessions two - 11).

- On July 23, 2020, both the physical therapist and the orthopedist assessed that Petitioner's pain and ROM were somewhat improved, and her main issue was ongoing weakness. Ex. 2 at 78 – 85 (PT session 12, and progress note); Ex. 3 at 12 – 13 (orthopedics reevaluation). The orthopedist ordered an MRI to rule out a rotator cuff tear. Ex. 3 at 13; *see also* Ex. 2 at 72 – 76 (PT sessions 13 – 15).

- On August 3, 2020, the orthopedist reviewed that the MRI (Ex. 3 at 21) had found tendinitis, fraying, strain, and bursitis but no full thickness rotator cuff tear. Ex. 3 at 7. Petitioner received a second steroid injection, and was told to continue taking NSAIDs and attending PT. *Id.*; *see also* Ex. 2 at 40 – 71 (PT sessions 16 – 29).

- On September 8, 2020, Petitioner attended her 30th PT session. She was "getting better, the shoulder seems more stable… Reporting less pain, overall with lifting and AROM exercises… Would continue to benefit from skilled PT at this time focusing on mobility and functional stability." Ex. 2 at 38; *accord* Ex. 3 at 2 (orthopedics follow-up appointment that same date, noting that Petitioner would "continue PT and transition to HEP"). However, with that 30th session on September 8, 2020, Petitioner reached the limit on PT that would typically be covered by her health insurance plan. Ex. 13 at 3; Ex. 2 at 113; *but see id.* at 11 (reflecting that insurance made at least partial payments for dates of service through September 18, 2020). Coincidentally, September 8, 2020, marked the end of her FMLA-protected unpaid leave, and her return to work, Ex. 14 at 3.

- Despite the insurance issue, Petitioner continued to attend PT. *See generally* Ex. 2 at 26 – 37 (PT sessions 31 – 38). September 28, 2020, marked her 39th session, and a detailed progress note reflects a changed assessment from "adhesive capsulitis" to merely "left shoulder weakness"; and pain ratings of 0/10 at rest and 2/10 with activity. *Id.* at 23. Additionally, by September 28th the shoulder had full ROM, 4+/5 strength, and normal glenohumeral joint mobility. *Id.* The therapist recommended just two to three sessions for three more weeks (i.e., until October 19, 2020). *Id.* at 24.

- Two additional PT sessions, on September 30 and October 2, 2020, do not document any new findings. Ex. 2 at 17 – 18. But Petitioner reported that her "L arm feels stronger than [her] R arm now." *Id.* at 17. Then on October 6, 2020, she cancelled all further appointments. *Id.* at 118 ("discharged to HEP").

- The formal discharge summary, dated October 21, 2020, states that Petitioner was "performing at [her] prior level of function," and had 0/10 pain at rest and with activity. Ex. 2 at 15. In addition to the previously-noted normal ROM and glenohumeral joint stability, she now had *full* strength of 5/5. *Id.* Petitioner was discharged because she had "met all goals for therapy." *Id.*

- Thereafter, between October 23, 2020 – June 28, 2022, Petitioner had at least *21* medical encounters that do not document any ongoing left shoulder injury or residual effects. Instead, these encounters primarily focused on Petitioner's acute complaint of *right-sided* arm pain, numbness, and cramps.

- After initially raising that complaint to her PCP on October 23rd (Ex. 4 at 31 – 38), Petitioner underwent electromyography ("EMG") and nerve conduction velocity ("NCV") studies of the right arm which suggested a neuropathy,[5] and established care with a neurologist who prescribed gabapentin (*see e.g.*, Ex. 12 at 4 – 5). Then on November 25th, in an effort to rule out a more "diffuse polyneuropathy," the neurologist obtained EMG/NCV studies of the *left* arm and left leg. Ex. 12 at 12 – 14. There was electrophysiological evidence that the left arm had an "isolated left median neuritis," but no corresponding exam findings or treatment at neurology follow-ups on January 8 and July 9, 2021. *Id.* at 14, 7 – 8, 9 – 11 (organized chronologically).

- In August 2021, Petitioner returned to the orthopedics practice, where she underwent repeat right-sided EMG/NCV studies (Ex. 7 at 2 – 4, 8 – 9). An orthopedic surgeon diagnosed right-sided cubital tunnel syndrome and, performed an ulnar nerve decompression in September 2021 (Ex. 7 at 68 – 69). The orthopedic surgeon managed Petitioner's ongoing right-sided complaints, which involved occupational therapy ("OT") and a steroid injection to the right hand first web space, until December 2, 2021. *See generally* Ex. 7 at 13 – 59. Afterwards on December 31, 2021, a physical medicine and rehabilitation ("PM&R") specialist

---

[5] The November 2020 EMG/NCV studies of the right arm was ordered by the PCP, and completed at Swedish American Hospital. Ex. 4 at 35. While the findings are discussed by several providers (*see e.g.*, Ex. 4 at 26 – 27; Ex. 12 at 4 – 5; Ex. 7 at 2 – 3), the actual EMG/NCV report does not appear to be filed.

6

evaluated Petitioner's ongoing right-sided complaints. *Id.* at 61 – 63. Again, none of these records document an ongoing left-sided injury.

- On October 9, 2023, Petitioner met with a different orthopedic surgeon for the first time. Ex. 7 at 65. She reported that a 2020 tetanus vaccine had caused left shoulder pain, limited ROM, and difficulty in lifting her arm. *Id.* The orthopedic surgeon documented that a physical examination revealed positive Hawkins and Neer's signs, but full strength of 5/5. *Id.* And there is not clear documentation of reduced ROM of the *shoulder*. *See id.* at 66 ("*Cervical* exam: Cervical motion is full and pain free. Globally reduced ROM.") (emphasis added). X-rays were unremarkable. *Id.* at 66. The new orthopedic surgeon assessed left shoulder pain and adhesive capsulitis. *Id.* He provided a steroid injection, and a course of oral steroids for any continued pain. *Id.* There are no subsequent records.

- **Affidavits.** Upon initiating her claim in September 2021, Petitioner spoke of her injury entirely in the past tense and did not claim any ongoing pain or dysfunction. *See generally* ECF No. 1-8.

- In contrast, *after* the severity issue was raised, *see* ECF No. 17, Petitioner stated that in October 2020, she discontinued formal PT for her left shoulder, because she could not afford the out-of-pocket costs, and she was confident performing home exercises (citing her training as a nurse). Ex. 5 at ¶¶ 17 - 18. She recalls diligently continuing those home exercises diligently, gradually increasing her functionality, and having pain upon raising her left arm until "approximately February 2021." *Id.* at ¶¶ 19 - 21. But as of May 2022, Petitioner was still experiencing periodic "instances during which it will become very painful to lift or use her arm." *Id.* at ¶ 23.

- A nursing assistant recalls that after her September 2020 return to work, Petitioner had ongoing left shoulder pain, stiffness, and decreased ROM, and needed assistance lifting and carrying items. These issues slowly improved, but were still present upon the nursing assistant's departure from the workplace in January 2021. Ex. 6 at ¶¶ 8 – 9.

- Petitioner's sister recalls that she opted for a home exercise program because her formal PT entailed out-of-pocket costs, travel, and arranging for childcare. Ex. 8 at ¶¶ 7 – 9. The sister states that Petitioner complained of difficulties keeping up at work in fall 2020. *Id.* at ¶ 11. Finally, from the sister's personal observation, as of November 2023, Petitioner "still does not have full motion in her shoulder, and I can tell that her right shoulder now sits higher and is flatter in appearance than the left shoulder." *Id.* at ¶ 12.

## IV.   Analysis

Petitioner must preponderantly establish that after her June 11, 2020 vaccination, she suffered a left shoulder injury and residual effects persisting until at least December 11, 2020. Section 11(c)(1)(D)(i).

The Program recognizes that a petitioner's discharge from formal medical care does not necessarily establish the complete resolution of an injury, with no residual effects. *See, e.g.*, *Silacci v. Sec'y of Health & Hum. Servs.*, No. 21-1265V, 2024 WL 5295093, at *4 (Fed. Cl. Spec. Mstr. Dec. 5, 2024), citing *Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014). Here, Ms. Holmes has provided some explanation that additional PT would have involved significant out-of-pocket costs, and that her medical background was useful while performing home exercises.

But the medical record evidence is not ambiguous about severity in a way that can be construed in her favor. The physical therapist was open to continuing formal sessions until about October 19, 2020. Ex. 2 at 24. But *Petitioner* ended formal PT several weeks earlier – reporting that her "L arm feels stronger than [her] R arm now" and she was "performing at [her] prior level of function." *Id.* at 17, 15. The therapist confirmed that Petitioner had regained full range of motion, stability, and strength; and she had met all goals. *Id.* at 15. This contemporaneous objective evidence does not suggest that any residual symptoms were present in early October 2020 *or* would have continued for two more months.

There is also no "presumption that medical records are accurate and complete as to all the patient's physical conditions." Brief at 8, citing *Kirby*, 997 F.3d at 1383. But Ms. Holmes's post-PT discharge medical records are problematic because of their specific context. In particular from October 2020 – January 2021, when she allegedly had a residual, if improving, left shoulder injury, she repeatedly complained of a *right* arm injury, and was evaluated for a potentially more diffuse neuropathic condition. But apart from electrodiagnostic evidence suggesting a left-sided median neuritis, Ex. 12 at 14 (which might represent an exclusionary diagnosis for a Table SIRVA claim, 42 C.F.R. § 100.3(15)(c)(iv)), there was no documentation of an ongoing left-sided injury, during medical encounters when it logically could have been reported and/or identified. *Compare Kirby*, 997 F.3d at 1383 (hypothesizing: "A patient having a heart attack is not likely to mention his runny nose, nor is his physician likely to record it").

Petitioner has not sufficiently addressed these issues. The witness statements offered are overall less compelling, because they do not acknowledge her intervening

right-sided complaints. And while the October 2023 orthopedics appointment record contains *some* objective exam findings and evidence of treatment for a left shoulder injury, it occurred over *three years* after the PT discharge, with a new provider who depended on Petitioner's own incomplete medical history (focusing on a vaccine injury, and not acknowledging her intervening issues). I previously warned Petitioner that this kind of a medical encounter would have questionably probative value. ECF No. 33; *accord* Response at 6, citing *Gerami v. Sec'y of Health & Hum. Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014) (affording little weight to a report made after the fact, in the context of litigation). Overall, there is not preponderant evidence to support Petitioner's allegation that her left shoulder injury was severe enough for Program eligibility.

## Conclusion

Petitioner has not established the statutory severity requirement. Therefore, she is ineligible to pursue compensation under the Program. In the absence of a timely-filed motion for either reconsideration or review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this Decision.[6]

**IT IS SO ORDERED.**

                                                    **s/Brian H. Corcoran**
                                                    Brian H. Corcoran
                                                    Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.